D̶ᶠ F
c/M

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
CIRA BAUTISTA VASQUEZ
INDIVIDUALLY, ON BEHALF OF
VICTOR ARTURO MEDINA BAUTISTA,
A MINOR, AND AS REPRESENTATIVE
OF THE ESTATE OF GUMERSINDO
MEDINA DUARTE, DECEASED, ALSO
KNOWN AS ARTURO MEDINA
DUARTE

**MEMORANDUM AND ORDER**
Case No. 07-CV-1121(FB)(JO)

        Plaintiff,

   -against-

FCE INDUSTRIES, LTD., GMD
SHIPYARD CORP., ALLIED
TRANSPORTATION LLC
AS OWNER AND OPERATOR OF T/B
ATC 23,

        Defendants.

--------------------------------------------------------x

*Appearances:*
*For the Plaintiff:*
WENDY FLEISHMAN, ESQ.
Lieff, Cabraser, Heimann & Bernstein, LLP
780 Third Avenue, 48th Floor
New York, NY 10017

ENRIQUE SERNA, ESQ.
Serna & Associates, PLLC
20985 Ten West Serna Building
San Antonio, TX 78257

JOSEPH S. JAWORSKI, ESQ.
The Jaworski Law Firm
2301 Strand, Ste. 200
T. Jeff League Building
Galveston, TX 77550

*For Defendant Allied Transportation LLC:*
PATRICK J. BONNER, ESQ.
Freehill, Hogan & Mahar
80 Pine Street
New York, NY 10005

*For Defendant GMD Shipyard Corp.:*
JOSEPH E. DONAT, ESQ.
Herzfeld & Rubin, P.C.
40 Wall Street
New York, NY 10005

**BLOCK, Senior District Judge:**

On January 23, 2007, Gumersindo Medina Duarte ("Medina") fell to his death while working on a ship in dry-dock at Brooklyn Navy Yard. Plaintiff Cira Vasquez, Medina's widow and a citizen and resident of Mexico, sued GMD Shipyard Corporation ("GMD"), the general contractor overseeing the renovation of the ship,[1] on behalf of herself, Medina's estate, and the minor child of Vasquez and Medina. Plaintiff asserted four theories of recovery: (1) common-law negligence; (2) N.Y. Labor Law § 200; (3) N.Y. Labor Law § 240(1); and (4) N.Y. Labor Law § 241(6).[2] A bench trial as to liability was held from May 19-21, 2008. The following constitutes the Court's findings of facts and conclusions of law, requiring the entry of judgment in favor of GMD as to all claims.

## FINDINGS OF FACT

### I. General Background

The tragic incident that precipitated this lawsuit took place aboard the *ATC 23*, a tank barge owned by Allied Transportation, LLC ("Allied").[3] Allied had contractually

---

[1] Prior to trial, defendant Allied Transportation LLC settled with plaintiff. Defendant FCE Industries has not answered the complaint or otherwise appeared; the answering defendants reported that it is no longer in existence.

[2] Plaintiff's complaint also asserts a claim against GMD pursuant to 33 U.S.C. § 905(b). *See* Amended Compl. ¶¶ 26-30. That code section, however, creates a cause of action only against a *vessel* whose negligence causes injury; GMD, the sole remaining defendant, is not a "vessel." *See* 33 U.S.C. § 902. Plaintiff also asserts claims for Medina's wrongful death and, derivatively, for Medina's pain and suffering prior to his death. *See* Amended Compl. ¶¶ 34-37. These claims, however, are predicated on GMD's alleged negligence; because the Court holds that plaintiff cannot establish negligence, the Court does not separately address them.

[3] These findings of fact are derived from the parties' Stipulation of Facts dated May 20, 2008, *see* Docket Entry # 71, and the Court's further findings based on

engaged defendant GMD to renovate the *ATC 23* so that it could carry #6 oil in its tanks. GMD, in turn, had engaged Hudson Industrial Supply Company ("Hudson") as a subcontractor to perform, *inter alia*, fitting and welding work aboard the *ATC 23* in connection with the renovation.[4] Medina, plaintiff's decedent, was employed by Hudson, the subcontractor, as a part-time welder. Throughout this time, the *ATC 23* was dry-docked in a graving dock located on navigable waters in the Brooklyn Navy Yard in Brooklyn, New York.[5]

## II. Physical Description of the Work Site

On the day of Medina's death, he was working on the floor of the #2 starboard tank of the *ATC 23* ("the tank"), one of four large tanks in the ship's interior. The tank's floor was approximately forty feet below the main deck of the ship. The walls of the tank were lined with a series of horizontal steel ribs, called "angle irons," which provided

---

testimony and evidence presented at trial.

[4] GMD and Hudson were both controlled by the same individual, Michael Cranston. Nonetheless, neither party has argued that the Court should ignore the formal separation of these two entities and treat Medina as an employee of GMD. If Medina *were* GMD's employee, suit against GMD would be preempted by the workers'-compensation scheme set forth in the Longshore and Harbor Workers' Compensation Act ("LHWCA"), which is "exclusive and in place for all other liability of [the] employer to the employee, his legal representative, husband or wife . . . ." 33 U.S.C. § 905(a); *see Claudio v. United States*, 907 F. Supp. 581 (E.D.N.Y. 1995) (holding that contractor and injured worker's employer were effectively a single entity, and thus, that LHWCA exclusivity provisions barred suit against contractor).

[5] "A graving dock looks like a huge, concrete bathtub sunk into the ground. One end of the dock opens onto a harbor, river or other waterway. When a ship enters the dock, shipyard workers place a . . . gate . . . against the open end. Pumps send the water out and the vessel slowly sinks . . . . When repairs are completed, workers flood the dock until the water reaches the same level as the water outside the gate. It is opened and the ship leaves." *J.M.L. Trading Corp. v. Marine Salvage Corp.*, 501 F. Supp. 323, 326 n.2 (E.D.N.Y. 1980).

structural support. These angle irons were spaced approximately two-and-a-half feet apart and protruded between five and eight inches from the wall.

The tank was accessible from the ship's deck via two access ladders: the first ladder descended from a hatchway in the main deck to a platform about halfway up the tank wall, and the second ladder descended from the opposite edge of this platform to the tank's floor. These ladders were used solely for access purposes – in other words, workers did not actually *perform work* (fitting, welding, or otherwise) while on the ladders. Each ladder was designed to accommodate one person at a time. There were no fall-prevention or fall-protection devices installed at the site of the ladder (such as safety nets or lifelines).

### III. Medina's Accident

On January 23, 2007, Medina was working on the floor of the tank with three other Hudson employees: Raphael de la Cruz ("de la Cruz") and Jordys Reed ("Reed") were fitting brackets and supports for heating coils, while Medina and Mario Concepcion ("Concepcion") were welding those brackets and supports. Medina and Concepcion were using welding torches connected to regulator devices which controlled the heat of the torches' flame. These devices were located on the main deck of the *ATC 23*, such that Medina and Concepcion had to ascend and descend via the access ladders in order to adjust their torches.

At approximately 10:30 a.m., Medina began ascending the lower tank access ladder to adjust his welding torch, while Concepcion was already in the process of descending that same ladder from the platform midway up the tank wall. Medina and Concepcion met on the lower ladder approximately six to eight feet from the bottom of the

tank. Rather than return to the tank floor and wait for Concepcion to finish descending, Medina moved laterally off the ladder and stepped onto one of the angle irons that provided structural support to the tank wall. Then, instead of waiting for Concepcion to pass him and then returning to the ladder, Medina began climbing up the tank wall itself by means of the angle irons.

Moments after passing Concepcion, Medina lost his grip and fell from the angle irons to the floor of the tank. He was immediately knocked unconscious. Medina was brought to the Brooklyn Hospital Center emergency department and was pronounced dead at 12:30 p.m. that same day. The listed cause of Medina's death was "Blunt Impact Injuries Of Head And Torso." Ex. 63 (Report of Autopsy).[6]

Prior to Medina's fatal fall, Hudson workers aboard the ATC 23 rarely, if ever, stepped off the tank access ladders and climbed vertically on the angle irons.[7]

---

[6] "Ex." refers to exhibits entered into evidence at trial.

[7] Medina's fellow welder, Concepcion, testified that in his ten years of working at the shipyard, he had never seen anyone else climbing on the angle irons of a ship. The court credits his testimony. On the other hand, Martin Fernandez, another Hudson employee, testified at trial that he saw workers on the angle irons "many times." Tr. at 195:4-7. Given the blatant conflicts between his trial testimony (in which he claimed that Medina did not even climb the angle irons) and his earlier deposition (in which he testified that Medina *had* fallen from the angle irons), the Court finds Fernandez's testimony on this point not credible.

Plaintiff submitted an OSHA inspection report which contains certain statements from workers on the ATC 23 regarding whether workers stepped on the angle irons. Although the OSHA inspection report *itself* is admissible hearsay under Federal Rule of Evidence 803(8) as the report of a public agency, the employee statements *within* these reports are inadmissible double-hearsay. *See Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991). Accordingly, the Court has given these statements no evidentiary weight. In any event, the Court would not credit them over Concepcion's testimony because the statements are vague and largely unsourced.

## IV. Supervision and Control of Medina's Work

No employee of defendant GMD directly supervised or controlled the manner or method of the work being performed in the tank at any relevant time. Rather, supervisors from GMD would "only come in when the work is done" in order to approve the work of its subcontractor's employees. Tr. at 195:8-12.[8] No GMD employee was present in the tank on the day of Medina's death.

Mike DiMisa, a GMD employee, was the general supervisor for the entire shipyard; he supervised the overall progress of the work being performed on the *ATC 23*, but not the manner or methods of that work. Ernest Wiggins, a GMD employee, was the port engineer for the entire shipyard; he gave technical plans and specifications to the Hudson employees working in the tank three or four times a week, but did not directly supervise or control the manner or methods of their work.

## V. Safety Equipment and Safety Training

Safety equipment, including harnesses, safety belts and other fall-protection equipment, was available aboard the *ATC 23* for Hudson workers' use. Such equipment was required to be used, and was in fact used, when Hudson workers *performed work* at an elevation (e.g., while on a scaffold or while outside the railing of the barge's deck). On the other hand, Hudson employees did not customarily use safety equipment merely to *ascend or descend* ladders, and Medina did not use such equipment when climbing the tank access ladder on January 23, 2007.

---

[8] "Tr." refers to the transcript of the bench trial.

GMD held weekly safety meetings in the weeks prior to January 23, 2007. Ladder-safety training was provided at these safety meetings on at least one occasion. As part of such training, workers were told that only one person was to be on a ladder at a time. Some Hudson employees attended these meetings. Medina, however, did not attend any of the meetings, as it was not Hudson's practice to require its part-time employees, such as Medina, to attend. Consistent with that practice, Medina was not reprimanded for his failure to attend safety meetings.

GMD's safety manual contained a section concerning ladder safety, which instructed workers: "Face the ladder as you go and hold on with both hands. Keep your body between the rails and keep a firm grip on the ladder." Ex. 23. The document also stated, "Only one worker is allowed on a ladder unless the ladder is designed for additional workers." *Id.* Medina was not given a copy of the safety manual, but copies were given to GMD supervisors, who were instructed to convey the information to workers on the *ATC 23.* There is no evidence, however, that this particular information was ever conveyed to Medina.

## VI. OSHA's Findings

The U.S. Department of Labor Occupational Safety and Health Administration ("OSHA") investigated Medina's death. As a result of the investigation, OSHA cited Medina's employer, Hudson – not GMD – for six violations of federal occupational safety and health standards regulations, only one of which is relevant here: specifically, Hudson was cited for violating 29 C.F.R. § 1915.12(d)(2) by "not train[ing] employees] in the hazards of tank work" and "not train[ing] employees] in the hazards

involved in the use of a ladder by two-way traffic as employees [are] gaining access/exiting the confined space." Ex. 60, Certified OSHA Report 310692223, at 51.

## CONCLUSIONS OF LAW

### I. The Existence and Effect of Maritime Jurisdiction

As a preliminary matter, the Court addresses the consequences, if any, of the maritime nature of this case, since plaintiff invokes the Court's maritime jurisdiction. *See* Amended Compl. ¶ 10.

"An action arises under admiralty jurisdiction where (1) the plaintiff's accident occurred on navigable waters; and (2) the accident bears a 'significant' or 'substantial' relationship to traditional maritime activity." *Sydney v. United States*, No. 94-CV-5956 (JG), 1998 WL 765129, at *2 (E.D.N.Y. June 30, 1998) (citing *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 533 (1995)). In *Sydney*, a court in this district applied this two-part test to a similar fact pattern, where the plaintiff had been injured on a dry-docked vessel undergoing renovations. The *Sydney* court held that admiralty jurisdiction existed because (1) torts occurring on a dry-docked ship occur "on navigable waters" for jurisdictional purposes;[9] and (2) an injury occurring "during the

---

[9] The dry-dock in *Sydney* was a "floating" dry-dock (a platform that floats at all times on the surface of the water), 1998 WL 765129, at *2, but the dry-dock in this case was a "graving dock" (a basin dug into the land at the water's edge that was temporarily sealed off and drained). The Court, however, finds this distinction immaterial. *See, e.g., Butler v. Robins Dry Dock & Repair Co.*, 240 N.Y. 23, 24 (1925) ("The contention . . . is that a grav[ing] dock . . . is part of the land, and that therefore, when a vessel rests in such a dock from which all of the water has been drawn, it is really on land, and that an accident happening to a person then on the vessel . . . is not a maritime tort. We think . . . a vessel floated into a dock of this kind is still in navigable waters even though the water has been temporarily withdrawn." (citations omitted)); *Torres v. City of New York*, 581 N.Y.S.2d 194, 196-202 (2d Dep't 1992) (affirming that the holding of

overhaul of a vessel" bears "a significant relationship to traditional maritime activity." *Id.* at *2-*3 (citations omitted). Admiral jurisdiction exists here for the same reasons it existed in *Sydney*.

Of course, "[w]ith admiralty jurisdiction comes the application of substantive admiralty law." *E. River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 864 (1986). Nevertheless, that this is a maritime case does not affect plaintiff's negligence claim since "federal maritime law incorporates common law negligence principles generally, and New York law in particular." *Becker v. Poling Transp. Corp.*, 356 F.3d 381, 388 (2d Cir. 2004) (citation omitted).

The same is true with respect to plaintiff's three claims under the New York Labor Law, but they require a slightly more involved analysis. It is well-settled that "[t]he exercise of admiralty jurisdiction . . . does not result in automatic displacement of state [statutory] law . . . ." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 206 (1996) (internal quotation marks and citation omitted). Rather, "a [s]tate may modify or supplement the maritime law by creating liability which a court of admiralty will recognize

---

*Butler* "is fully consistent with what United States Supreme Court precedent there exists, and has not been overruled, implicitly or otherwise"), *abrogated on other grounds by Eriksen v. Long Island Lighting Co.*, 653 N.Y.S.2d 670 (2d Dep't 1997); *Travelers Ins. Co. v. McManigal*, 139 F.2d 949, 949-52 (4th Cir. 1944) (holding that injury that occurred in graving dock drained of water occurred "at a place within the admiralty jurisdiction of the federal courts"); *but see Florio v. Olson*, 129 F.3d 678, 680 (1st Cir. 1997) (holding that "permanent drydocks are considered 'land' for the purposes of [admiralty jurisdiction,]" but citing as precedent only cases concerning piers and docks, *not* dry-docks); *Dirma v. United States*, 695 F. Supp. 714, 718 (E.D.N.Y. 1988) (holding that "when a dry dock is affixed to the shore, it is not within admiralty jurisdiction") (criticized in *Sydney*, 1998 WL 765129, at *2 n.7, and in *Torres*, 581 N.Y.S.2d at 202).

and enforce when the state action is not hostile to the characteristic features of the maritime law or inconsistent with federal legislation." *Gravatt v. City of New York*, No. 97 CIV. 0354(RWS), 1998 WL 171491, at *10 (S.D.N.Y. Apr. 10, 1998) (quoting *Just v. Chambers*, 312 U.S. 383, 399 (1941) (internal quotation marks omitted)), *rev'd on other grounds*, 226 F. 3d 108 (2d Cir. 2000).

The federal courts which have confronted the issue have held that the New York Labor Law provisions at issue here are not preempted by federal maritime law "because New York has an important interest [in] regulating safe construction practices within the State . . . and no burden would be placed on the objectives of . . . any . . . federal concern" by applying them. *Id.* at *14; *see also McAllister v. G & S Investors*, 358 F. Supp. 2d 146, 150 (E.D.N.Y. 2005) ("No concern requiring preemption is present here."); *Palanquet v. Weeks Marine, Inc.*, 333 F. Supp. 2d 58, 66 (E.D.N.Y. 2004) ("[E]ven assuming *arguendo* that federal admiralty jurisdiction is applicable here, plaintiffs' claim under the New York Labor Law would not be preempted." (citations omitted)), *vacated in part on other grounds*, 352 F. Supp. 2d 361 (E.D.N.Y. 2005). For the same reasons, the Court agrees that plaintiff's Labor Law claims are not preempted by federal maritime law.[10]

---

[10] Some lower New York state courts have held that federal maritime law preempts claims under New York Labor Law § 240(1), because of its unique "strict-liability" aspect, but not claims under §§ 200 or 241(6), the other sections relevant here, because they require proof of actual negligence. *See, e.g., Eriksen v. Long Island Lighting Co.*, 653 N.Y.S.2d 670, 670 (2d Dep't 1997) ("Since traditional principles of maritime law permit a defendant to be held liable only upon proof of actual negligence, the strict liability provisions of [§ 240(1)] are preempted . . . ." (citations omitted)). But the New York Court of Appeals has held that federal maritime law *did not* preempt claims under *any* of these sections of the Labor Law in a case where they were asserted not against "vessel operat[ors], but rather . . . [against] landowners and contractors within the State[,]" which is also true here. *Cammon v. City of New York*, 95 N.Y.2d 583, 589 (2000).

## II. Negligence and Labor Law § 200

New York Labor Law § 200 simply "codifi[es] . . . the common law duty of an owner or employer to provide employees with a safe place to work." *Bailey v. Irish Dev. Corp.*, 711 N.Y.S.2d 241, 241 (3d Dep't 2000) (citations omitted). As such, an action under § 200 is "synonymous with [a common-law negligence] claim . . . ." *Colon v. Lehrer, McGovern & Bovis, Inc.*, 687 N.Y.S.2d 130, 130 (1st Dep't 1999).

Here, plaintiff does not assert her negligence and § 200 claims against Medina's *employer*, Hudson, but rather, against GMD, the *general contractor* who engaged Hudson. Because, generally speaking, "[a] general contractor . . . [does not have a duty] to protect employees from defects in a subcontractor's equipment or unsafe work practices," *Carney v. Allied Craftsman Gen. Contractors, Inc.*, 780 N.Y.S.2d 441, 441 (3d Dep't 2004) (internal quotation marks and citation omitted), to succeed on a negligence or § 200 claim against a general contractor, "[a] plaintiff is required to demonstrate that the . . . general contractor supervised or controlled the work performed *or* had actual or construct[ive] notice of [some] unsafe condition which precipitated plaintiff's injury." *Bailey*, 711 N.Y.S.2d at 241 (citation omitted) (emphasis added).

### A. *GMD Did Not Supervise or Control Medina's Performance*

Liability for injury to a subcontractor's employee under the "supervision or control" branch of § 200 or common-law negligence attaches only where the general contractor "controlled *the manner in which the plaintiff performed his or her work*, i.e., how the

---

In any event, "Preemption is an issue of federal law and this Court is not bound by state court decisions." *Gravatt*, 1998 WL 171491, at *13 (citations omitted).

injury-producing work was performed." *Hughes v. Tishman Constr. Corp.*, 836 N.Y.S.2d 86, 86 (1st Dep't 2007) (emphasis in original); *see, e.g., Carney*, 780 N.Y.S.2d at 441(finding no liability where general contractor "did not specifically direct [subcontractor's] method or manner of work . . . [and its] involvement was limited to brief visits to the work site from time to time to ensure that [subcontractor] had the materials it needed and that the work was being done according to the plans").

Here, no GMD employee *directly* supervised or controlled the *manner* of Medina' performance; supervisors from GMD would "only come in when the work [was] done" in order to approve the Hudson employees' work. Tr. at 195:8-12. Nonetheless, plaintiff argues that GMD "regularly inspected the tank where the work was to be undertaken to determine if it was 'safe for work[,]'" and that "GMD workers . . . had authority to stop performance of the work in order to correct unsafe work practices." Mem. of Law in Support of Pl's. Verdict on Liability (hereinafter "Pl. Br.") at 6. This, however, is decidedly not enough to establish a duty under § 200 or common-law negligence principles. *See Blysma v. County of Saratoga*, 744 N.Y.S.2d 564, 564 (3d Dep't 2002) ("[T]he retention of general supervisory control . . . or authority to enforce general safety standards is insufficient to establish the necessary control" for general-contractor negligence liability (internal quotation marks and citation omitted)).

Indeed, it is uncontroverted that no GMD employee was present in the tank on the day of Medina's accident; even if this alone is not *dispositive* of the question, it is nonetheless *persuasive evidence* that GMD did not directly supervise the manner of Medina's performance. *See, e.g., Kazmierczak v. Town of Clarence*, 737 N.Y.S.2d 177, 177 (4th Dep't

2001) (finding no liability under § 200 where, "although . . . [defendants] exercised general supervisory control over the project and had authority to direct the correction of safety violations, [there was] no evidence that defendants were actually supervising plaintiff's actions on the day of the accident") (citations omitted); *Fairchild v. Servidone Constr. Corp.*, 733 N.Y.S.2d 735, 735 (3d Dep't 2001) (finding no liability under § 200 or common-law negligence where, *inter alia*, "none of the . . . defendants had representatives at the site [on the day of the accident] to exercise any supervisory control over the manner or method that plaintiff performed his work"); *Gonzalez v. Turner Constr. Co.*, 801 N.Y.S.2d 310, 310 (1st Dep't 2005) (no liability under § 200 or common law negligence where, *inter alia*, "no one from [general contractor] was present at the time of the accident"); *Martucci v. Tirro Constr. Corp.*, 743 N.Y.S.2d 668, 672 (Sup. Ct. Richmond County 2002) (finding no liability under § 200 where, *inter alia*, "[the general contractor's] employees were [not] present at the time of the accident").

Consequently, the Court holds that GMD lacked the supervision and control necessary to be found liable under Labor Law § 200 or common-law negligence principles.

**B. *Medina's Injury Was Not Caused by a "Dangerous Condition on the Premises"***

Even where direct supervision or control is absent, a subcontractor's employee may still recover against a general contractor under § 200 or common-law negligence principles "where . . . [the] plaintiff's injuries stem not from the manner in which the work was being performed, but, rather, from a dangerous condition on the premises," provided that the general contractor "ha[d] control over the work site and actual or constructive notice of the dangerous condition." *Keating v. Nanuet Bd. of Educ.*, 835

N.Y.S.2d 705, 705 (2d Dep't 2007) (citations omitted).  Such condition must be "inherently dangerous" and not "in plain view . . . ."  *Mollano v. RC Dolner Constr. Co.*, 859 N.Y.S.2d 904, 904 (citing cases); *see also DeLong v. State St. Assocs. L.P.*, 621 N.Y.S.2d 172, 172 (finding no liability under § 200 where "the 'defect' which caused [plaintiff's] fall . . . was obvious and readily observable by anyone" (citation omitted)).

Here, plaintiff argues that the accident resulted from "a dangerous condition at the workplace, specifically, a forty-two foot unguarded hull access ladder." Pl. Br. at 3. But the ladder was free from material defects and firmly secured to the wall; moreover, any danger the ladder presented was open and obvious.  The ladder, therefore, is not a "dangerous condition" in the necessary sense. *See Mollano*, 859 N.Y.S.2d at 904 ("In this case the ladder was clearly visible and by the reasonable use of one's senses was an obvious condition. Moreover, . . . such ladder was [not] defective in any way. Thus, the ladder was not a dangerous condition as a matter of law." (citation omitted)).

In conclusion, because plaintiff has neither shown the requisite supervision or control nor shown the existence of a "dangerous condition" on the premises, plaintiff has not established that GMD owed Medina any duty under § 200 or common-law negligence principles.[11]

## III. Labor Law § 240(1)

New York Labor Law § 240(1), known as the "Scaffold Law," provides that owners or contractors "shall furnish or erect, or cause to be furnished or erected . . . .

---

[11] Because no duty exists, the Court need not address the breach and causation elements of negligence.

scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to [their workers]." Liability under § 240(1) has been referred to as "strict" or "absolute" in the sense that "owners or contractors not actually involved in construction can be held liable, regardless of whether they exercise supervision or control over the work[,]" and in the sense that contributory negligence cannot defeat, nor comparative negligence reduce, a plaintiff's recovery. *Blake v. Neighborhood Housing Servs. of New York City, Inc.*, 1 N.Y.3d 280, 287 (2003) (internal citations omitted).

Nevertheless, as the New York Court of Appeals has stressed, "the mere fact that [a plaintiff] fell . . . is insufficient, in and of itself, to establish that the device [provided by the defendant] did not provide proper protection." *Id.* at 288 (citation omitted) (first alteration in original). In other words, § 240(1) does not require "that a defendant . . . be treated as an insurer after having furnished a safe workplace." *Id.* at 286. To that end, despite the purportedly "strict" liability under this section, where "[a] ladder afforded [plaintiff] proper protection . . . [and p]laintiff's conduct . . . was the *sole proximate cause* of the accident[,]" recovery under § 240(1) is not permitted. *Id.* at 290 (emphasis added); *see also McAllister*, 358 F. Supp. 2d at 149 ("While the contributory negligence of a worker is no defense to a Section 240 action, a worker's active intentional conduct may release an owner from liability under the statute.").

## A. *GMD Provided an Adequate Safety Device*

Plaintiff argues that GMD's failure to install "personal protective equipment" such as harnesses or lifelines at the access ladder constitutes a violation of § 240(1). But

plaintiff misconstrues the statute's mandate: it does not require that a general contractor

provide *failsafe* protection from falls, but merely that it provide "proper protection." *Blake*,

1 N.Y.3d at 288. Here, a ladder – *itself* one of the very "safety devices" enumerated in the

statutory text – *was indeed* provided to tank workers. Again, the ladder was in perfectly

good condition and was securely attached to the tank wall. Medina's fellow employees

testified that in their opinion, harnesses were unnecessary because the ladder provided

adequate fall protection on its own. And GMD's expert testified convincingly that "never

. . . in all [his] years and history of ships" has he seen workers use harnesses or safety lines

merely for *climbing* a ladder (as opposed to *doing work* on a ladder). Tr. at 213:8-25. For

these reasons, the court finds that the ladder on its own provided "proper protection";

thus, backup safety devices were not required pursuant to § 240(1).

*Felker v. Corning*, 90 N.Y.2d 219 (1997), a case cited by plaintiff for the

ostensible proposition that "a ladder alone is not sufficient under Labor Law § 240(1) to

meet the requirement of adequate safety devices[,]" Pl. Br. at 16, actually establishes the

opposite. Plaintiff quotes the following excerpt:

> [T]here were two distinct elevation-related risks associated
> with the paint detail that plaintiff was directed to perform.
> The first risk was created by the need to elevate plaintiff to the
> height above the alcove wall, and the stepladder was the
> enumerated safety device provided to protect the worker from
> the risk inherent in having to work at a height . . . . No
> allegations were raised that the ladder itself was defective, that
> it slipped, tipped, was placed improperly or otherwise failed
> to support plaintiff at that elevation. Thus, . . . we are not
> concerned with the adequacy of this particular ladder as a
> device to safely elevate plaintiff.
>
> More importantly, a second risk was created here by plaintiff's
> need to reach over the eight-foot alcove wall and work over an

> elevated, open area. It is the contractor's complete failure to
> provide any safety device to plaintiff to protect him from this
> second risk of falling over the alcove wall . . . that leads to
> liability under Labor Law § 240(1) in this case.

*Felker*, 90 N.Y.2d at 224 (internal citations omitted).

In this case, Medina – unlike the plaintiff in *Felker* – was not *performing work* at a height. Rather, he merely needed to elevate himself to the ship's deck, and the ladder was the enumerated safety device provided for doing so. As it was not defective or improperly placed or anchored, the Court is "not concerned with the adequacy of this particular ladder as a device to safely elevate [Medina]." *Id.* And because Medina did not need to "reach [out] . . . and work over an elevated, open area[,]" *id.*, there was simply no need for the second device that was called for in *Felker*.

## B. *GMD's Failure To Provide Ladder Safety Training to Medina Is Immaterial*

Plaintiff argues that GMD's failure to ensure that Medina received ladder-safety training was also a violation of § 240(1). But that statute on its face requires only that employers provide "scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other *devices* . . . ." (emphasis added). As the New York Court of Appeals has observed, "an instruction by the employer or owner to avoid . . . engaging in unsafe practices is not itself a 'safety device'" within the meaning of § 240(1). *Stolt v. Gen. Foods Corp.*, 81 N.Y.2d 918, 920 (1993).[12]

---

[12] Even so, the Court can conceive of *some* circumstances where a failure to train could violate the statute. For example, if a safety device is complex enough to make it effectively useless without proper instruction, special training might be necessary so as to *meaningfully* "furnish" the device to workers, as the statute's text commands. But this is not such a case: the Court, as fact-finder, concludes that merely *climbing* a ladder is a common and ordinary task which requires no special training, at least under these

## C. *In Any Event, Medina's Actions Were the Sole Proximate Cause of His Injury*

Even assuming *arguendo* that GMD had failed to provide adequate safety devices, "[i]t is plaintiff's burden to prove that [the failure to do so] was the proximate cause of plaintiff's injury before liability is imposed." *Martucci*, 743 N.Y.S.2d at 675 (citations omitted).

Despite the so-called "strict-liability" aspect of § 240(1), New York courts regularly find proximate cause lacking where a worker's own *misuse* of a defect-free ladder caused the plaintiff's injury. *See, e.g., Blake*, 1 N.Y.3d at 291 ("the record . . . supports the jury's finding[] that . . . plaintiff alone, by negligently using the ladder with the extension clips unlocked, was fully responsible for his injury."); *Meade v. Rock-McGraw, Inc.*, 760 N.Y.S.2d 39, 39 (1st Dep't 2003) ("That the ladder was inadequately secured was due to plaintiff's improper use of it, which would not give rise to a [§ 240(1)] violation."); *Gomes v. State of New York*, 708 N.Y.S.2d 316, 316 (2d Dep't 2000) (affirming dismissal of § 240(1) claim on ground that plaintiff's misuse of ladder was responsible for his accident); *Secord v. Willow Ridge Stables, Inc.*, 684 N.Y.S.2d 867, 870 (Sup. Ct. Monroe County 1999) ("[I]t would clearly have been possible for a reasonable jury to conclude that the accident was caused by this misuse [of the ladder] rather than any defect in the ladder itself or its placement or operation . . . .").

---

circumstances. The New York courts do not disagree. *See, e.g., Wesley v. Long Island Power Auth.*, 728 N.Y.S.2d 50, 50 (2d Dep't 2001) ("The plaintiff was engaged in the common and ordinary activity of descending a ladder at the time she was injured, precluding liability for a failure to train[ or] instruct"); *Hernandez v. Bd. of Educ.*, 694 N.Y.S.2d 752, 752 (2d Dep't 1999) (same).

Presumably, in these cases, some redundant safety device could have prevented the plaintiffs' injuries – but that did not foreclose the fact-finders from concluding that the plaintiffs' own misuse of the ladders was the sole proximate cause of their injuries. Similarly, in this case, the Court determines that Medina's intentional act of stepping off the ladder and climbing the angle irons was the sole proximate cause of Medina's fall. Thus, as a matter of law, no liability can exist under § 240(1).

Indeed, the Second Department has held that no liability existed under § 240(1) in a case with facts quite like these. In *Urias v. Orange County Agricultural Society, Inc.*, the plaintiff worker "needed a ladder to complete [his work task], but it was being used by someone else at the time. The plaintiff decided to scale the beams on the wall . . . instead of waiting for the ladder. When he grasped one of the beams, it broke, and he fell approximately 17 feet to the ground." 776 N.Y.S.2d 92, 92 (2d Dep't 2004). The Second Department concluded that "the plaintiff's unforeseeable act of climbing the wall . . . was the sole proximate cause of the accident[,]" thus foreclosing liability under § 240(1). *Id.* (citations omitted). The facts here are not materially different: rather than wait for Concepcion to finish descending the access ladder, Medina decided to climb the tank wall; this unforeseeable act cuts off any liability that would otherwise exist under § 240(1).

## IV. Labor Law § 241(6)

Labor Law § 241(6) "imposes a nondelegable duty upon an owner or general contractor to see to it that . . . operations at the workplace are conducted so as to provide for the reasonable and adequate protection of the workers . . . ." *Buckley v. Columbia Grammar and Preparatory*, 841 N.Y.S.2d 249, 249 (1st Dep't 2007) (citation omitted). Because

the duty is nondelegable, a plaintiff "need not show that defendants exercised supervision or control over [the] worksite in order to establish his right of recovery." *Ross v. Curtis-Palmer Hydro-Elec. Co.*, 81 N.Y.2d 494, 502 (1993). However, this provision "is not self-executing"; rather, "[t]o establish liability under [§ 241(6)], a plaintiff must specifically plead and prove the violation of an applicable [New York] Industrial Code regulation" which "constitute[s] a specific, positive command" and does not "merely reiterate[] the common law standard of negligence." *Buckley*, 841 N.Y.S.2d at 249 (citing *Ross*, 81 N.Y.2d at 502-04). As with claims under § 240(1), the alleged statutory violation must "be the proximate cause of the plaintiff's injury." *Id.*

## A. *OSHA Regulations Cannot Give Rise to Liability Under § 241(6)*

In her complaint, plaintiff points to certain federal OSHA regulations, arguing that the violation of these regulations serves as a predicate for liability under § 241(6). *See* Amended Compl. ¶ 60. But "[a] plaintiff's attempt . . . to use Federal OSHA regulations as a predicate for his Labor Law § 241(6) claim against a nonsupervising owner or general contractor must fail." *Rizzuto v. L.A. Wenger Contracting Co.*, 91 N.Y.2d 343, 351 (1998); *see also Khan v. Bangla Motor & Body Shop, Inc.*, 813 N.Y.S.2d 126, 126 (2d Dep't 2006) ("OSHA governs employee/employer relationships. Since [owner] was not an employer of the decedent . . . , the OSHA regulations do not provide a specific statutory duty, a violation of which would result in [owner's] liability.") (internal citations omitted).

## B. *The Code Provision Regarding "Hazardous Openings" Is Not Applicable*

Plaintiff also alleges that GMD violated § 241(6) by failing to comply with

N.Y. Comp. Codes R. & Regs. tit. 12, § 23-1.7(b)(1) (hereinafter "§ 23-1.7(b)(1)"), the section

of the Industrial Code that addresses "[h]azardous openings" at construction sites. Subpart

(i) of that section provides that "[e]very hazardous opening into which a person may step

or fall shall be guarded by a substantial cover fastened in place or by a safety railing . . . ."

Subpart (iii) continues:

> Where employees are required to work close to the edge of
> such an opening, such employees shall be protected as follows:
>
> > ([a]) Two-inch planking, full size, or material of equivalent
> > strength installed not more than one floor or 15 feet,
> > whichever is less, beneath the opening; or
> >
> > ([b]) An approved life net installed not more than five feet
> > beneath the opening; or
> >
> > ([c]) An approved safety belt with attached lifeline which
> > is properly secured to a substantial fixed anchorage.

Unlike OSHA regulations, these provisions *are* adequate predicates for establishing a

violation of Labor Law § 241(6). *See Luckern v. Lyonsdale Energy Ltd. P'ship*, 722 N.Y.S.2d

632, 632 (4th Dep't 2001); *O'Connor v. Lincoln Metrocenter Partners, L.P.*, 698 N.Y.S.2d 632,

632 (1st Dep't 1999).

That said, § 23-1.7(b)(1) is simply not applicable to the facts of this case. By

its terms, that section applies only where a worker "step[s] or fall[s]" into a "[h]azardous

opening[.]" *See, e.g., Pepe v. Ctr. for Jewish History, Inc.*, No. 106495/04, 2008 WL 1971529

(Sup. Ct. N.Y. County Apr. 23, 2008) (worker fell through 3-foot hole in roof); *Cunha v. City

of New York*, No. 108414/05, 2007 WL 4442415 (Sup. Ct. N.Y. County Dec. 7, 2007) (worker

fell through uncovered manhole). Here, by contrast, Medina did not step or fall into an

"opening" in the surface of the work site. Falling off a narrow ledge on a vertical wall is

not falling into an "opening" in any plausible sense of that word. *See Lambert v. J.A. Jones Constr. Group, LLC*, 850 N.Y.S.2d 323, 327 (Sup. Ct. Bronx County 2007) ("[T]he step or fall must be into an *'opening' in the surface* where an employee is walking or working, *not off the edge* . . . ." (emphasis added) (citation omitted)); *DeLong*, 621 N.Y.S.2d at 172 (holding that where worker fell off edge of elevated terrace on which he was working, "the elevation difference that caused [his] fall is simply not an 'opening'").

It is instructive that New York courts have consistently found § 23-17(b)(1) inapplicable in cases where an employee fell while climbing a staircase or ladder. *See, e.g., Smith v. McClier Corp.*, 831 N.Y.S.2d 413, 413 (1st Dep't 2007) (holding worker who fell from staircase that lacked railing did not fall into "hazardous opening"); *Frank v. Meadowlakes Dev. Corp.*, 686 N.Y.S.2d 540, 540 (4th Dep't 1998) (holding that plaintiff who "fell backwards down a temporary staircase . . . did not fall through a hazardous opening") (citations omitted); *Riccio v. NHT Owners, LLC*, No. 32163/04, 2006 WL 2689702, at *1, *8 (Sup. Ct. Kings County Aug. 23, 2006) (holding that where plaintiff "fell from near the top of an A-frame, fiberglass ladder" in an elevator pit, "accident did not involve a fall into a hazardous opening"). Although Medina was climbing the angle irons, not the access ladder itself, the Court nonetheless cannot perceive any meaningful distinction between these ladder/staircase cases and the present case. Consequently, GMD is not liable under § 241(6) for any alleged violation of § 23-1.7(b)(1).

## CONCLUSION

While the Court expresses its deepest sympathies for the tragic loss suffered by plaintiff and her child, the Court is bound by law to deny plaintiff any recovery in this

suit. Nevertheless, it bears noting that plaintiff has not been denied *all* compensation for Medina's death: Congress has specifically guaranteed payment to those in plaintiff's position under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), which "establishes a comprehensive federal workers' compensation program that provides longshoremen and their families with medical, disability, and survivor benefits for work-related injuries and death." *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 96 (1994). The LHWCA"holds employers liable, irrespective of fault, for securing payment of the prescribed compensation . . . [,]" *Gravatt*, 1998 WL 171491, at *12, and is "exclusive and in place for all other liability of [the] employer to the employee, his legal representative, husband or wife . . . ." 33 U.S.C. § 905(a). Here, the Court merely holds – as it must – that under these particular circumstances, plaintiff cannot obtain *further* compensation outside of this comprehensive statutory scheme by looking to GMD, a party other than her decedent's employer.

Accordingly – and regretfully – judgment must be entered in GMD's favor as to all claims.


**SO ORDERED.**

s/Frederic Block

FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
September 10, 2008